360 So.2d 1119 (1978)
Thomas HENDRICKS, Appellants,
v.
The STATE of Florida, Appellee.
No. 77-1475.
District Court of Appeal of Florida, Third District.
July 18, 1978.
*1120 Bennett H. Brummer, Public Defender and Elliot H. Scherker, Asst. Public Defender, for appellants.
Robert L. Shevin, Atty. Gen. and Steven R. Jacob, Asst. Atty. Gen., for appellee.
Before BARKDULL and NATHAN, JJ., and CHARLES CARROLL (Ret.), Associate Judge.
BARKDULL, Judge.
Thomas Hendricks appeals a final judgment of conviction and sentence, entered upon a jury verdict finding him guilty of involuntary sexual battery with force not likely to cause physical injury, false imprisonment, unlawful possession of a firearm while engaged in a criminal offense, and carrying a concealed weapon.
Hendricks, a paraplegic, met Cantor (the victim) in the lounge where she is a nude dancer. At her request, he arranged to drive her home, as she usually drove home with customers. On the drive to her house, Hendricks made a wrong turn and drove to a deserted area. According to Cantor, Hendricks shocked her with a Taser gun,[1] handcuffed *1121 her hands and feet[2] and, without her consent, forced her to perform oral sex upon him. According to Hendricks, the various acts took place, but not only was it with Cantor's consent but it was upon an agreed price of eighty dollars.
Cantor and Hendricks were on the ground outside the automobile when two officers with the Florida Game and Fresh Water Commission drove past. Cantor was nude and Hendricks was nude from the waist down. The two officers approached the car, when they observed it contained no occupants and, after asking for identification, Cantor said: "Officer, help, officer" to the officer requesting identification. One officer removed Cantor to the police car, and the other officer held Hendricks at bay with a shotgun after ordering him to "freeze". One officer obtained the keys from Hendricks and his fellow officer in an effort to obtain the keys to unlock the handcuffs binding Cantor's hands and legs.[3]
After Cantor was uncuffed, she informed Officer Zell that Hendricks had a gun and a knife in the car.[4] In conducting searches *1122 for these weapons, the officer seized two firearms and a knife from Hendricks' automobile. Subsequent discussion with Hendricks produced a third firearm. The car was subsequently towed to the processing garage of the Dade County Public Safety Department, where it was thoroughly searched, resulting in discovery of certain other weapons.
All of the aforementioned searches were conducted without a warrant. Hendricks' motion to suppress the evidence produced by these searches and seizures was denied. The cause was tried by a jury, which found Hendricks guilty of involuntary sexual battery with force not likely to cause serious personal injury; false imprisonment; unlawful possession of a firearm while engaged in a criminal offense; and carrying a concealed firearm. Prior to sentencing, Hendricks moved to be certified for examination and hearing, pursuant to Section 917.14, Florida Statutes (1975), to determine whether he is a mentally disordered sex offender as defined by Section 917.13, Florida Statutes (1975). The trial court denied the motion and stated: "There will be an appointment of Dr. Boozer for this purpose, and also for the purpose of conferring with the officer conducting the presentence investigation." Thereupon, the trial judge entered his order appointing Dr. Boozer to conduct an examination of Hendricks and to give her opinion, among others, as to "* * * Whether the Defendant, Thomas Hendricks, is a mentally disordered sex offender within the meaning of Section 917.14 of the Florida Statutes and was at the time of the alleged offense; * * *".
At time of sentence, the trial judge (notwithstanding Dr. Boozer's evaluation of Hendricks, to wit: "* * * He qualifies, under present Fla. Statutes, as a mentally disordered sex offender as per Chapter 917") sentenced Hendricks as follows: As to count one fifteen (15) years in the state penitentiary; As to count two five years in the state penitentiary to begin at the expiration of sentence imposed in count one; As to count four, five years in the state penitentiary to run concurrent with the sentence imposed in count one; As to count three imposition of the sentence was withheld and Hendricks was placed on five years' probation to begin at the expiration of the sentences imposed in counts one and two. A condition of that probation was successful completion of Dr. Boozer's program as a mentally disordered sex offender.
Hendricks has raised five points on appeal, which we shall discuss in the order presented.
As to point one, he contends the trial court erred in denying his motion to suppress the physical evidence seized, where the evidence was the product of an unreasonable warrantless search. We find this point to be without merit. Under the facts of this case, the officers had probable cause to believe evidence of the crime was concealed in the automobile and, therefore, the warrantless search was not unconstitutional. Olsen v. State, 338 So.2d 225 (Fla.3d DCA 1976); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).
As to point two, Hendricks contends the trial court erred in restricting his cross-examination of the victim. The cross-examination restricted by the trial court *1123 sought to inquire into reluctance on the part of the victim to testify at the trial of this cause, which Hendricks contends was properly admissible as relating to the credibility of the witness, relying on Ward v. Ochoa, 284 So.2d 385 (Fla. 1973); Kallas v. State, 284 So.2d 421 (Fla.3d DCA 1973); McDuffie v. State, 341 So.2d 840 (Fla.2d DCA 1977). We must reject this contention under the facts of the instant case. In the authorities relied upon there was a showing that the reluctance of the witnesses to testify were situations where it was apparent the witnesses' testimony was affected by financial considerations. In the instant case there is no such showing. Even if we were to accept comments made by Hendricks' counsel at a side-bar conference as true, which we cannot do as they were never placed in evidence [see: Millican v. Hunter, 73 So.2d 58 (Fla. 1954); Hubbard v. Hubbard, 233 So.2d 150 (Fla.4th DCA 1970); Hill v. Douglass, 271 So.2d 1 (Fla. 1972)], the most they could show would be a mere reluctance to testify which, without more, would have no bearing on the witness' credibility. Therefore, the excluded evidence would not have been relevant to credibility and cross-examination of the witness was properly restricted.
By his third point, Hendricks alleges the trial court committed fundamental error in failing to instruct the jury that the offense of involuntary sexual battery requires proof of an intent to attain sexual arousal or gratification. In support of this contention, Hendricks relies on this court's holding in State v. Alonso, 345 So.2d 740 (Fla.3d DCA 1977), alleging that by virtue of the holding therein intent is an essential element of the crime of sexual battery, which must be alleged and proved. Under the facts of this case, we must disagree with Hendricks' interpretation of the effect of the holding in State v. Alonso, supra. To that end we shall revisit our holding in State v. Alonso, supra, in an attempt to clarify our holding therein for the benefit of the bench and bar.
At common law, the crime of rape was a crime malum in se and in crimes malum in se intent is presumed. Talley v. State, 160 Fla. 593, 36 So.2d 201 (1948). Subsequent to enactment of laws making rape a statutory offense, the Supreme Court (in dealing with the question) held that the law makes the act of rape a crime and infers a criminal intent from the fact itself. Thus, no specific intent is requisite other than that evidenced by the doing of the acts constituting the offense. Simmons v. State, 151 Fla. 778, 10 So.2d 436 (1942); Askew v. State, 118 So.2d 219 (Fla. 1960). The Legislature enacted Chapter 72-724, Laws of Florida (1972), wherein it removed the gender connotation in the statute, making rape a crime of ravishing or carnally knowing a person. This led to the case of Washington v. State, 302 So.2d 401 (Fla. 1974), dealing with the rape of a man, wherein the Supreme Court held that carnal knowledge was not limited to vaginal penetration but also included penetration of the anal or oral orifices. The present sexual battery law was enacted, wherein by definition it codified the previous case law and defined a sexual battery as meaning "* * * oral, anal, or vaginal penetration by, or union with, the sexual organ of another[[5]] * *". At this juncture, there was no essential difference between the sexual battery statute and the prior crime of rape, which we perceive to be the intent of the Legislature. The Legislature then proceeded to broaden the limited scope of included sexual conduct to include "* * * anal or vaginal penetration of another by any other object;[[6]] * * *". It was this latter provision that we were dealing with in State v. Alonso, supra, wherein there was vaginal penetration by a medical instrument. Clearly, when an object other than the actor's sexual organ is brought into union with the victim a question of intent to derive sexual gratification comes into play and becomes a necessary element of the crime. If this were not so, innocent conduct not intended by the Legislature to be included would be made criminal.
*1124 However, under facts such as those in the instant case (where the act involves the sexual organ of the actor) there can be no question that the act itself infers a criminal intent requiring no specific intent other than that evidenced by the doing of the acts constituting the offense, (Askew v. State, supra) and intent of the actor to attain sexual gratification is not an element of the crime which must be alleged and proved. Therefore, we find the third point raised herein to be without merit.
Hendricks' fourth point alleges the trial court erred in basing the sentences imposed in this case in part upon the fact that he had not admitted his guilt nor displayed contrition, and upon its belief that he had committed perjury. This point is also without merit. Many factors go into the sentencing process; not the least of these is the gravity of the offense and the demeanor of the accused and his potential for rehabilitation. Davis v. State, 123 So.2d 703 (Fla. 1960); State v. Boyer, 166 So.2d 694 (Fla.2d DCA 1964). As stated in Davis v. State, supra, at page 711: "Crime must be punished but it is the consideration of the individual that should determine the kind of treatment appropriate to his case. Responsibility should be the basis of punishment, and individualization the criterion of its application; such is the formula of modern penal law. * * *". Hendricks' counsel argued his reasons for mitigation of sentence and the trial judge responded thereto in kind, and we will not infer from that response an intent by the trial judge to increase Hendricks' sentence. Those comments, taken in context with the statements of all parties at time of sentencing, in no way demonstrate the trial judge had any intent other than to sentence Hendricks as he did. Therefore, inasmuch as the sentences are within the limits proscribed by law, the propriety thereof will not be disturbed on appeal. Weathington v. State, 262 So.2d 724 (Fla.3d DCA 1972); Wilkinson v. State, 322 So.2d 620 (Fla.3d DCA 1975).
Hendricks' fifth and final point alleges that the trial court erred in refusing to certify him as a mentally disordered sex offender, pursuant to Chapter 917, Florida Statutes (1975), where the record reflects probable cause to believe the defendant is a mentally disordered sex offender. Also that the court erred in refusing to appoint two psychiatrists to examine the defendant and in failing to hold an evidentiary hearing as required by Chapter 917, Florida Statutes (1975), and in ordering the defendant to serve a term of imprisonment prior to receiving treatment. We agree with Hendricks that the trial court abused its discretion in refusing to certify him for an examination and hearing pursuant to Section 917.14, Florida Statutes (1975).
Section 917.14(1)(b), Florida Statutes (1975) states the trial judge may certify a defendant for hearing and examination where there is probable cause to believe that the person is a mentally disordered sex offender. In the instant case, at the time Hendricks moved for certification, probable cause was at best questionable and the trial court's discretion was probably not abused. However, at that time the trial court appointed Dr. Boozer to examine Hendricks and report back on the specific question of whether or not Hendricks qualified as a mentally disordered sex offender within the meaning of Chapter 917, Florida Statutes (1975). Dr. Boozer's report stated Hendricks so qualified and, at that time, sufficient probable cause existed to necessitate a hearing and examination pursuant to Section 917.14, 917.17, 917.18, Florida Statutes (1975). Hobbs v. Cochran, 143 So.2d 481 (Fla. 1962); Dorman v. State, 279 So.2d 854 (Fla. 1973). Therefore, we conclude there was probable cause to believe Hendricks was a mentally disordered sex offender within the meaning of Chapter 917, Florida Statutes (1975), and the trial court abused its discretion in failing to conduct a hearing thereon.
Therefore, the sentences imposed herein are hereby vacated and the cause is remanded to the trial court with directions to conduct a requisite hearing pursuant to Chapter 917, Florida Statutes (1977) to determine whether or not Hendricks is a mentally disordered sex offender. If he so *1125 qualifies, the trial court must commit him to the Department of Health and Rehabilitative Services for care, treatment, and rehabilitation pursuant to Section 917.19, Florida Statutes (1977). If Hendricks is not found to qualify as a mentally disordered sex offender, he may then be properly sentenced in accordance with the applicable laws. However, under no circumstances can treatment be required at the completion of the sentence. Gonsovowski v. State, 350 So.2d 19 (Fla.2d DCA 1977); Compare Hoshaw v. State, 359 So.2d 920 (Fla.3d DCA 1978), opinion filed June 20, 1978.[7]
Accordingly, the convictions appealed herein are affirmed, but the sentences are vacated and the cause is remanded to the circuit court with directions.
NOTES
[1] David L. Gilbert, a crime investigator for the Dade County Public Safety Department, testified as to the disposition of the Taser gun in Hendricks' vehicle as follows:

* * * * * *
"Q Did you, yourself, take out the Taser gun that was in the car?
"A Yes, sir, I did.
"Q Were you careful to notice how the Taser gun was hooked up to the car?
"A Yes, sir, I was.
"Q Would you explain to the jury on the diagram State's Exhibit 19 how the Taser gun was hooked up in this particular car?
"A The weapon itself was resting on the floorboard of the left front floor next to the driver's seat. The wires from the one cassette that had been fired previously ran under a square floor mat which was laying on the left front floor to a position under neath the dash area. It ran across the carpeted section of the floor, over the transmission tunnel, behind the console containing miscellaneous radio equipment, to a position on the right front floor under a similar square floot mat on the right side, underneath the right seat, up through the rear carpeted section of the seat support for the right front seat.
The wires then ran between the gap of the seat back and seat seat, if you will, on the right front seat and the end of the wires then were inserted into the slits which had been made in the vinyl car seat, embedded in the seat itself."
* * * * * *
[2] Cantor testified as to being handcuffed as follows:

* * * * * *
"A He unhandcuffed the handcuffs behind my back and handcuffed my hands in front of me.
"Q He now has handcuffed your hands in the front. What is the next thing that you remember happening?
"A He took my feet out of the leather straps.
* * * * * *
"Q Then what happened?
* * * * * *
"A * * * and the next thing I know is I saw another pair of handcuffs and I said to him, `You don't have to put the handcuffs on me. I'm not going to run away.
"Q What, if anything, does he say?
"A He said he wasn't taking any chances."
[3] Wildlife Officer Alan Lee Zell, one of the officers who found Cantor at the scene, testified as follows:

* * * * * *
"Q What did you do next?
"A I asked Officer Melvin for his handcuff key. He handed it to me.
I took the ones off her wrists, placed them on the hood of the car and tried to get the ones off of the ankle.
"Q Then what happened?
"A The key that Officer Melvin had did not fit the handcuffs on the ankles, so I went back to the defendant and asked him where the keyes to the handcuffs were on the ankles.
* * * * * *
"Q What, if anything, did he say to you?
"A He advised me he believed there were on the dash of the car.
* * * * * *
"Q What did you do after you got the keys off the dash?
"A I went back to our patrol car and shined the keys in the spotlight, finding another handcuff key, went and undid the handcuffs that were on her ankles and placed those handcuffs and those keys on the hood of the car."
* * * * * *
[4] "Q What, if anything did you do then?

"A Reassured her and told her to go ahead and finish getting dressed and get in the car, and as she was getting in the car she stated, `He's got a gun.'
"Q What, if anything, did you do?
"A I asked her  I said, `Where is it?'
At that time she told me it was on the floorboard, driver's side, next to the door between the door and the seat.
"Q What, if anything, did you do after you received that information?
"A I went to the car opening the door again, looking at the floorboard. Right next to the seat I found a PPK .9 millimeter gun.
* * * * * *
"Q What did you do when you observed the gun?
"A I took the gun and placed it back on the hood of our car.
* * * * * *
"A As I was placing it on the hood of the car, Officer Melvin advised me that she stated, `He's got a knife,' and at that time I walked back around to the rear door of our car and asked her.
I says, `You said he's got a knife?' And she said, `Yes.'
I said, `Where is it?'
"MR. DENARO: I object, hearsay.
"THE COURT: Overruled.
"A (Continuing) She advised me that it was stuck into the seat, the front seat, between the two seats."
* * * * * *
[5] Section 794.011(1)(f), Florida Statutes (1975).
[6] Section 794.011(1)(f), Florida Statutes (1975).
[7] It is to be noted that the trial court did not have the benefits of these authorities when he conditioned the probation imposed on Count III on successful completion of Dr. Boozer's program.